RUBIN LLC
*Attorneys for Samuel Pfeiffer*
Paul A. Rubin
345 Seventh Avenue, 21st Floor
New York, New York 10001
(212) 390-8054
(212) 390-8064 (fax)
prubin@rubinlawllc.com

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
                              :
In re:                         :        Chapter 11
                              :
AABS 1200 LLC,          :        Case No. 16-43204 (NHL)
                              :
         Alleged Debtor.    :
                              :
-------------------------------------------------------x

**AFFIRMATION OF SAMUEL PFEIFFER IN SUPPORT OF MOTION
FOR ORDER (I) CLARIFYING THAT AUTOMATIC STAY DOES NOT
APPLY TO NON-DEBTORS AND MODIFYING AUTOMATIC STAY AS
TO ALLEGED DEBTOR TO PERMIT STATE COURT ACTION AND
ARBITRATION TO PROCEED AND (II) CONDITONING DEBTOR'S
RIGHT TO DISPOSE OF PROPERTY UNDER 11 U.S.C. § 303(f)**

STATE OF NEW YORK      )
                                  ) ss.:
COUNTY OF KINGS       )

        SAMUEL PFEIFFER hereby affirms under penalty of perjury that the following is true:

        1.     I am an individual residing in Brooklyn, New York. I am over 18 years of age and I have personal knowledge of the facts set forth herein.

        2.     I respectfully submit this affirmation in support of my motion for entry of an order (I) clarifying that the automatic stay in effect in this case does not apply to non-debtors in certain prior pending state court litigation or arbitration described below, and for relief from the automatic stay pursuant to 11 U.S.C. § 362(d)(1) of the Bankruptcy Code so as to permit the state court

state court litigation and the arbitration contemplated by the parties to proceed as to alleged debtor AABS 1200 LLC ("AABS" or the "Alleged Debtor"); and (II) conditioning the Alleged Debtor's right to dispose of property.

### FACTUAL BACKGROUND

### The Creation of the Master Contract

3. Jacob Birnbaum (a/k/a Yeshaye Bernbaum) ("Birnbaum") and Abraham Sofer ("Sofer") were members of AABS, which is a New York limited liability company. AABS entered into a contract of sale dated as of April 5, 2005 (the "Maltz Contract") to purchase from the Maltz Family Limited Partnership ("Maltz") the real property known as and located at 42-02 Fort Hamilton Parkway, Brooklyn, New York 11219, for $4,550,000 (the "Fort Hamilton Property").

4. After signing the Maltz Contract, over a course of years, AABS entered into a series agreements with Maltz to amend the Maltz contract so as to extend the date by which AABS must close on its purchase. In consideration for these extensions, Maltz charged AABS high monthly fees. AABS did not own any material asset other than its interest in the Maltz Contract.

5. In late 2009, after having signed at least nine such extensions, Birnbaum and Sofer were in financial difficulty. They found themselves unable to make the $25,000 per month payments that Maltz was demanding in order to keep the contract alive.

6. At approximately the same time, Birnbaum and Sofer had also fallen behind on making real estate tax and mortgage loan payments with respect to four other properties located in Brooklyn, which are unrelated to the Fort Hamilton Property but adjacent to each other, which Birnbaum, Sofer or Mr. Sofer's wife owned or controlled, namely 1038 42nd Street, 1040 42nd Street, 1048 42nd Street and 1052 42nd Street (collectively, the "Four Properties"). Before

December 2009, two of the properties had been badly damaged by a fire and the buildings on all Four Properties had been demolished. Foreclosure actions had been filed by the secured lenders with respect to each of these properties.

7. Birnbaum and Sofer sought out Mr. Hershey Fishman and me, as potential buyers of their assets. After extensive negotiations, we signed a contract of sale dated December 7, 2009 (the "Master Contract"), which is written in Hebrew and in laymen's terms, as none of us is an attorney. A copy of the Master Contract is annexed hereto as Exhibit A. In a nutshell the Master Contract provides that (i) Party A (the Birnbaum/Sofer side) is to transfer the Four Properties to Party B (the Fishman/Pfeiffer side), and Party B is obligated to negotiate mortgage settlements for the Four Properties; and (ii) Party A is to transfer the interests in AABS and AABS's rights under the Maltz Contract to Party B, and Party B is to pay Party A the sum of $2,000,000.

8. "Party A" under the Master Contract consists of "Mr. Yeshaye Jacob Bernbaum and his partner, Mr. Abraham Sofer and his wife, Mrs. Hendel Sofer, representing AABS 1200 LLC – 42nd Street properties LLC." Title to the Four Properties was held in the name of 42nd Street Properties LLC at the time that the Master Contract was signed.

9. Party B to the Master Contract "is the LLC which is known as PNMC11, and the LLC which is known as PNMC22; they are Mr. Hershel Fishman and his partner Mr. Shabsi Pfeiffer." Master Contract. p.1. Shabsi is my Hebrew name.

10. Mr. Birnbaum, Abraham Sofer and Hendel Sofer signed the contract for Party A, and Mr. Fishman and I signed the Master Contract for Party B. The signatories to the Master Contract are all individuals; none is a business entity.

11. Under the terms of the Master Contract:

(i) the transfer of the Four Properties is fully valid immediately as of the date of the contract (Section 3);

(ii) Party B would negotiate pay-offs of the mortgages encumbering and tax obligations associated with the Four Properties, (Section 3) in order to put an end to the various pending foreclosure proceedings;

(iii) At the request of Party A, the transfer of AABS' interests in the Maltz Contract would occur immediately, so that Party B would commence making payments of $25,000 each month going forward to Maltz in order to extend the time to purchase the Fort Hamilton Property, with Party B attaining "in a most effective and in an absolute manner all of the rights – and has committed to the obligations that appear" in the Maltz Contract, with the parties having "performed a . . . binding procedure to convey all powers and right to Party B." (Sections 4(a), 2(c)):

(iv) The deed to the Four Properties and the interests in AABS "will be transferred as of today to the control of Party B." (Section 4(a)):

(v) Party A was supposed to deposit into escrow documentation for the transfer of the interests of AABS in the Maltz Contract to Party B, in form acceptable to Party B's counsel, to be released to Party B in return for payment of $250,000 of the overall purchase price. (Section 2(a)); and

(vi) Significantly, the parties agreed that in the event of a dispute of their rights or obligations under the Master Contract, the dispute would be arbitrated before Rabbi Abraham Amram Meisels (the "First Arbitrator"), but Party B has the unilateral right to add the Rabbi of Chakeve [whose name is Rabbi Yitchok Chaim Seltenreich] (the "Second Arbitrator"), and if the two arbitrators did not get along, they could jointly select a third arbitrator to decide between them. (Section 8).

12. The reason why Party A was immediately transferring all interests in AABS and all of its rights under the Maltz Contract to Party B, as of the date of the Master Contract, was because Party B (specifically, I) had begun making the extension payments under the Maltz Contract, as amended, for the Fort Hamilton Property, and to permit AABS lay the groundwork for the development of the property intended by Party B. Party B was also to begin operating AABS in order to cause it to comply with the terms of the extensions of the Maltz Contract.

13. As reflected at the end of the last page of the Master Contract, by the time is was signed, I had already advanced $25,000 to cure AABS's default on its obligation make a $25,000 extension payment for the month of November, 2009.

14. The Master Contract expressly provides that Party B had no interest in acquiring the Four Properties without also acquiring the Fort Hamilton Property, or acquiring the Fort Hamilton Property without also acquiring the Four Properties. (Master Contract at Section 1(b)). The agreement is a "package deal." Party B's acquisition of both the Four Properties and the Fort Hamilton Property is the fundamental premise on which the entire agreement was based.

### Mr. Birnbaum's Initial Breaches of the Contract

15. The driving force behind Party A is Mr. Birnbaum. Mr. Birnbaum never caused Party A to deliver into escrow the relevant documents needed for the transfer relating to AABS as required under Section 2(a) of the Master Contract. I waited in vain to make the $250,000 payment, which I would have made had those documents been delivered into escrow.

16. Moreover, several weeks after we signed the Master Contract, I discovered that, despite their representations to me that they were the owners of AABS, Birnbaum and Sofer held only 99% of the interests in AABS, and that one Joseph Inzlicht owned a 1% membership interest in the entity. A copy of the Amended and Restated Operating Agreement for AABS is annexed hereto as Exhibit B. I learned to my astonishment after signing the Master Contract that in April 2005 Birnbaum and Sofer had agreed with Inzlicht that they could buy out his interest in AABS for the sum of $210,000, pursuant to an Agreement of Assignment and Assumption of Limited Liability Company Interest dated as of April 5, 2005 between Birnbaum, Sofer and Inzlicht. A copy of that agreement is annexed hereto as Exhibit C. Had Inzlicht's interest in AABS been disclosed to me before we signed the Master Contract, I would have

insisted that he be a signatory to the agreement and that his one percent membership interest in AABS be included in the sale.

17.     Given these problems, I contacted Birnbaum and Sofer to discuss them. At the time, Mr. Sofer simply assured me that these were "mere formalities" that would be dealt at a later time, once Mr. Birnbaum would put the required documents into escrow, which he never did.

### I Proceeded to Act in Accordance with the Master Contract and for AABS

18.     During the period from the signing of the Master Contract in late 2009 to May, 2014, I proceeded to negotiate settlements, and then to pay-off the mortgages encumbering the Four Properties, to pay ECB violation arrearages left behind by Messrs. Birnbaum and Sofer, and I paid all property taxes owed with respect to the Four Properties. In the aggregate, I paid over $1,425,000 to pay-off various mortgages that encumbered the Four Properties, and I paid over $200,000 for real estate taxes, real estate liens and environmental liens on the Four Properties. The last mortgage pay-off was made on May 30, 2014.

19.     Mr. Birnbaum and Mr. Sofer gladly provided me with information necessary for me to negotiate and effectuate the pay-offs of the mortgages that were encumbering the Four Properties.

20.     As previously mentioned, before the Master Contract was executed, a catastrophic fire severely damaged the Four Properties. After signing the Master Contract, I developed and constructed five buildings on these vacant properties and built twenty units slated to be condominiums from the ground up on these properties, at a cost of over $6,500,000. In particular, I arranged for filing plans for the subdivision of the Four Properties with the Department of Buildings ("DOB") on August 23, 2013, and the plans were approved by DOB on

October 24, 2013. Building permits were issued on January 28, 2014. I arranged for the submission of all necessary paperwork to the DOB, which "signed off" on the job. After the construction of the five new buildings was completed at my expense, the DOB issued a certificate of occupancy on April 5, 2016.

21.     During the period between November 2014 and March 2015, I also procured parties to buy units slated for the five buildings that I constructed on the Four Properties. After receiving approval from the Office of the New York Attorney General of an offering plan, we entered into contracts to sell approximately fifteen units in the new buildings.

22.     After signing of the Master Contract, I continued to make monthly payments to Maltz in the amount of $25,000, aggregating $2,000,000, solely in order to keep that contract alive for AABS. Notably, none of these eighty (80) payments of $25,000 each is to be credited against the purchase price under the Maltz Contract.

23.     Mr. Birnbaum and Mr. Sofer were aware of all this, and they were more than happy for me to make these payments and to pay for the construction work. In fact, on February 24, 2010, Mr. Birnbaum emailed me asking: "DID YOU SEND THE CHECK TO MALTZ ??? WAS DUE ON THE 22ND, ITS ALREADY 2 DAYS LATE." See Exhibit D annexed hereto.

24.     Similarly, on or about September 23, 2010 and November 24, 2010, when the monthly extension payments of $25,000 were just days late, Maltz issued letters to AABS declaring the payments late and demanding cure payments to be issued within five days of deliver of the notices. In each instance, Maltz sent copies of those notices to me by email and mail. See Exhibits E and F annexed hereto.

25.     On July 27, 2011, Gary Maltz sent an email advising that he received a wire transfer in the amount of $24,975, and requesting payment of the additional $25 that was due by

July 22, 2011. Mr. Maltz sent that email to me (listed as the first addressee), and to, among others, Mr. Sofer. The belatedly disclosed member of AABS, Mr. Inzlicht, was also copied on that email. See Exhibit G.

26.     Likewise, on May 21, 2012 and on September 21, 2012, I executed on behalf of AABS a Thirteenth Amendment to Contract of Sale and a Fourteenth Amendment to Contract of Sale, under which AABS and Maltz agreed to extension of the closing date under the Maltz Contract to January 21, 2013 and March 21, 2013, respectively. Copies of these amendments, which confirm that the purchase price under the Maltz Contract had been increased to $5,337,500, are annexed hereto as Exhibits H and I. Notably, I executed each of these documents in my capacity as managing member of AABS, and the Thirteenth Amendment requires notices under the Maltz Contract to be sent to me and my attorney Solomon Rosengarten. While sending me the fully signed Thirteenth Amendment to Contract of Sale, for example, Mr. Maltz copied Mr. Sofer on that email transmission. See Exhibit J. Of course, as I was paying Maltz $25,000 per month in exchange for these extensions, Birnbaum and Sofer did not object to my doing this as managing member of AABS. Indeed, at Mr. Sofer's request, I even met in person with Mr. Maltz to negotiate an extension of AABS's time to close under the Maltz Contract.

27.     I also signed a Fifteenth Amendment to Contract of Sale and a Sixteenth Amendment to Contract of Sale on behalf of AABS, under which Maltz agreed to extend the closing date on the sale under the White Castle Project to August 21, 2014 and then August 21, 2015. See Exhibits K and L. Again, Messrs. Birnbaum and Sofer were aware that I was arranging these extensions for AABS and they never protested.

28.     Since execution of the Master Contract and as Birnbaum, Sofer, Fishman and I contemplated when it was executed, I conducted business for and as AABS, working extensively on plans to develop the Fort Hamilton Property, including hiring engineers, architects and others to perform work and to draw up plans for the Fort Hamilton Property. White Castle's lease expires in 2018, so the property is likely to rise in value as the lease expiration draws closer.

29.     In contrast, since Mr. Fishman and I signed the Master Contract with them on December 7, 2009, Mr. Birnbaum and Mr. Sofer have not spent a penny on development of or taxes for any of the Four Properties, nor did they make any of the $25,000 monthly payments for extension/preservation of the Maltz Contract, were they involved in the planning for development of any of these properties.

30.     Ironically, Birnbaum and Sofer did profit in July 2010 by collecting $45,000 in fire insurance proceeds from a policy issued by Lloyds (Policy of Insurance #LC09793). Party B was entitled to collect those proceeds under Section 5 of the Master Contract.

### Yet Another Egregious Breach of the Master Contract

31.     In another shocking development, at the time of the closing in which I paid off the last of the mortgages encumbering any of the Four Properties in accordance with the terms of the Master Contract, Mr. Sofer and his wife raced to sign and record a warranty deed dated May 29, 2014 conveying the 1038 42nd Street property to Mr. Birnbaum's wife, Brendan Birnbaum. See Exhibit M. Additionally, Mr. Sofer simultaneously signed and recorded a warranty deed also dated May 29, 2014 conveying the 1050 42nd Street property (formerly known as 1048 42nd Street) from 42nd Street Properties LLC to Mr. and Mrs. Sofer. See Exhibit N. Birnbaum and Sofer had agreed to transfer these properties to Mr. Fishman and me under the terms of the Master Contract. Thus, after I literally spent years working to negotiate pay-offs of mortgages

encumbering the Four Properties, Birnbaum and Sofer blatantly prevented Mr. Fishman and me from obtaining the ownership instruments to which we are rightfully entitled under the terms of the Master Contract.

32. After I had expended millions of dollars and increased the value of the Four Properties, Mr. Birnbaum and Mr. Sofer intentionally reneged and diverted that which he had already effectively sold under the Master Contract.

33. Moreover, to this day, Birnbaum and Sofer have still had not deposited into escrow the documents for transfer of AABS's interest as required under the Master Contract.

### I Initiated Mediation and Then Arbitration Proceedings Against Mr. Birnbaum in Rabbinical Court

34. Due to these disturbing and material bad acts, misrepresentations and omissions, starting on July 3, 2014, I moved in a religious court to compel Birnbaum into arbitration proceedings before the rabbinical authority as provided for in the December 7, 2009 Master Contract.

35. I sought rabbinical court intervention to compel Birnbaum and Sofer to arbitrate our dispute before the rabbinical authority in the hope that, among other things, (i) deeds to the two of the Four Properties that had been wrongfully transferred would be delivered as requested by Mr. Fishman and me, and (ii) that the AABS ownership documents would be executed and escrowed at which time I would pay for the AABS ownership instruments to be released to me. I also sought arbitration to compel compliance with the remainder of the terms of the Master Contract.

36. I did not make payments to Mr. Birnbaum or Mr. Sofer, which were due under the Master Contract within eight months of the date of the last mortgage settlement pay-off (May 30,

2014), because of their dishonest acts. To be clear, I stand ready to make all payments as required under the Master Contract.

37. Not surprisingly, neither Birnbaum nor Sofer ever sent me a notice alleging that I was in default under the Master Contract, nor did they ever summon me to arbitration in rabbinical court.

**Mr. Birnbaum Ignored the Summons to Arbitration; Mediation Was Attempted**

38. Unfortunately, Mr. Birnbaum refused to appear to arbitrate before a rabbinical arbitrator as we had agreed. Mr. Birnbaum finally appeared in July, 2014, only after two summons were issued to him. He relented by agreeing to enter mediation before the First Arbitrator instead of arbitration.

39. We entered mediation, which was also signed by the First Arbitrator in or about August 21, 2014 to try to come to a resolution of our disputes. See Exhibit O.

**Mediation Talks Breakdown as Mr. Birnbaum Refuses to Honor the Master Contract**

40. Unfortunately, Mr. Birnbaum ceased appearing in the mediation. He steadfastly refused to perform his contractual obligations to sign the AABS transfer papers, deed the Four Properties to me or take other necessary remedial measures. This prompted another summons to be issued by the rabbinical court on January 11, 2015.

41. Mr. Birnbaum again did not respond to the summons, prompting the Rabbinical Court to send him a stern warning on January 25, 2015 that he was on the verge of being held in contempt. See Exhibit P.

42. This ultimately prompted Mr. Birnbaum to agree to appear before the rabbinical court. He signed a new agreement with me to enter into arbitration pursuant to the terms in paragraph 8 of the Master Contract.

43. Specifically, on April 22, 2015, Mr. Birnbaum and I signed a second arbitration agreement which acknowledges the provision in Section 8 of the Master Contract. A copy of the April 22, 2015 agreement is annexed hereto as Exhibit Q. According to Section 8, the governing section of the Master Contract, the parties would engage Rabbi Meisels (the First Arbitrator) as arbitrator, but Mr. Fishman and I had the right to add the Rabbi of Tchakeve (the Second Arbitrator) in the event of any perceived unfairness by Rabbi Meisels to me.

44. Notably, Mr. Fishman did not sign this second arbitration agreement, nor did Mr. Birnbaum ask him to sign it.

45. On May 26, 2015, Mr. Birnbaum submitted to the First Arbitrator his response to my complaint. On June 15, 2015, I submitted my response to Birnbaum's papers.

46. In the meantime, on April 2, 2015, Maltz had written to AABS "c/o Samuel Pfeiffer" with copies to Messrs. Birnbaum and Sofer via email, confirming that the closing deadline under the Maltz Contract was adjourned from May 12, 2015 to June 9, 2015. See Exhibit R hereto. I countersigned that letter as managing member of AABS on April 7, 2015. On May 18, 2015, the closing on the purchase was postponed again to July 22, 2015. Once again, I signed this extension in my capacity as managing member of AABS.

47. On June 21, 2015, the First Arbitrator suffered a heart attack. As a result, he was hospitalized for an extended period of time. In the interim, by letter dated June 29, 2015, I exercised my right under §8 of the Master Contract to add the Second Arbitrator as a rabbinical judge (Dayan) in the arbitration proceeding. See Exhibit S.

### Birnbaum and Sofer Commenced the State Court Action

48. Also on June 29, 2015, I was served with an order to show cause issued by the Supreme Court of the State of New York for the County of Kings (the "State Court") in a new

action seeking relief in aid of arbitration, filed by petitioners Mr. Birnbaum and Mr. Sofer and in the name of AABS, against me but not against Mr. Fishman, bearing index number 8197/2015 (the "State Court Action"). This order to show cause sought entry of an or enjoining me from changing the status quo and from "transferring, selling, leasing, pledging hypothecating or otherwise encumbering the properties known as 1038 42nd Street, 1040 42nd Street, 1048 42nd Street and 1052 42nd Street in Brooklyn, New York," and from closing on the purchase of the Fort Hamilton Property until such time as the arbitration pending in the rabbinical court is fully and completely resolved.

49. Notably, Messrs. Birnbaum and Sofer did not include a copy of the Master Contract in their submission commencing the State Court Action.

50. The Order to Show Cause was signed and scheduled for a hearing to be held in the State Court on August 19, 2015.

51. Next, the closing on the purchase of the Fort Hamilton Property was postponed for one year, again only because I was willing to pay a steep price for it. In order to prevent a forfeiture due to the passage of time, I executed on behalf of AABS an agreement with Maltz dated July 17, 2015 extending the closing date under the Maltz Contract to July 21, 2016, so that the status quo would be preserved while the rabbinical court arbitration was to proceed. See Exhibit T. To be clear, the only reason I signed this document was to preserve AABS's rights and interests under the Maltz Contract. (Since signing that document, I also continued paying $25,000 per month to Maltz to preserve the extension of AABS's time to close under the Maltz Contract). At the time, I firmly believed that a decision would be issued in the arbitration proceeding much in advance of the new July 21, 2016 outside closing date.

52. I learned in late July 2015 that the First Arbitrator became well enough to arbitrate. On July 27, 2015, I wrote asking the First Arbitrator to contact the Second Arbitrator about sitting together in the arbitration proceeding. See Exhibit U. On August 3, 2015, my counsel wrote to Mr. Birnbaum's counsel asking him to return to the rabbinical court arbitration. See Exhibit V. However, Mr. Birnbaum refused to continue the arbitration proceeding.

53. On August 19, 2015, the State Court recognized my right to add the Second Arbitrator to the rabbinical court arbitration proceeding. Accordingly, I consented to the State Court's issuance of a temporary restraining order (the "8/19/15 TRO") providing that I would be temporarily enjoined from changing the status quo with respect to the Four Properties or from acting in the name of AABS until the arbitration would be resolved, as this TRO also provided that the Second Arbitrator [Rabbi Tchakeve] would be added to the rabbinical arbitration proceeding. The 8/19/15 TRO also directed that the parties should proceed with the rabbinical arbitration proceeding within 45 days, i.e. by October 3, 2015. A copy of the 8/19/15 TRO is annexed hereto as Exhibit W.

54. By letter dated August 20, 2015, Solomon Rosengarten, Esq. wrote to the First Arbitrator and the Second Arbitrator on my behalf advising that I was prepared to participate in an arbitration of the disputes as required under the 8/19/15 TRO. A copy of this letter is annexed hereto as Exhibit X.

55. By letter dated August 23, 2015, counsel for Mr. Fishman, Geoffrey S. Hersko, Esq., wrote to counsel for Birnbaum and Sofer, Jeffrey S. Buss, Esq., advising that Mr. Fishman intended to participate in the arbitration before the First Arbitrator and the Second Arbitrator, that Mr. Fishman was also exercising the right of Party B under the Master Contract to add the

Second Arbitrator to the arbitration, and that Mr. Fishman had not waived his right to cross-examine Mr. Birnbaum in the arbitration. A copy of that letter is annexed hereto as Exhibit Y.

56. In a dramatic twist, on August 27, 2015, the First Arbitrator issued a declaration stating that, by signing the April 2015 agreement to proceed to arbitration, I had waived the right I had to add the Second Arbitrator to the proceeding, and that I should disassociate myself from the 8/19/15 TRO ruling that the Second Arbitrator be added to the arbitration proceeding. The First Arbitrator declared that he does not want to have any rabbi added to the arbitration proceeding. A copy of this August 27, 2015 declaration by the First Arbitrator is annexed hereto as Exhibit Z.

57. In other words, in disregard of Section 8 of the Master Contract, and without regard to Mr. Fishman's interest under the Master Contract, the First Arbitrator absolutely refused to arbitrate the dispute together with the Second Arbitrator as ordered by the State Court.

58. The decision by the First Arbitrator to flout the States Court's 8/19/15 TRO was and is most disturbing. Since the First Arbitrator issued his August 27, 2015 declaration, Mr. Birnbaum, Mr. Sofer and the First Arbitrator have continuously refused to comply with 8/19/15 TRO to convene an arbitration together with the Second Arbitrator. They have not responded to my solicitations to return to arbitration as required in accordance with this order of the State Court.

59. It was never my intent to waive the right to add the Second Arbitrator to the arbitration proceeding. Moreover, Mr. Fishman is included in Party B under the Master Contract, and he also has the right, as part of Party B under Section 8 of the Master Contract, to add the Second Arbitrator. It would make no sense, wasteful and cause confusion to have two arbitration proceedings before different arbitrators to determine the same rights of Party B

against Party A under the same contract. While the First Arbitrator did meet with the parties to attempt to mediate the dispute in 2014, no hearing or meeting was held with the First Arbitrator to arbitrate the dispute after the signing of the April 22, 2015 agreement to arbitrate.

60. I am advised by counsel that interpretation of the parties' agreement to arbitrate under the Master Contract and the April 22, 2015 agreement is a matter to be determined by the State Court, not the First Arbitrator.

61. On October 13, 2015, the State Court entered an order to show cause to consider my motion to find Birnbaum in contempt of court for refusing to arbitrate in compliance with the terms of the 8/19/15 TRO, directing the parties to proceed to arbitration before the Second Arbitrator, or to alternatively to appoint a substitute arbitrator in place of the First Arbitrator.

62. On October 14, 2015, the State Court entered an order to show cause to consider a motion by the petitioners in the State Court Action to hold me in contempt for allegedly violating the terms of the 8/19/15 TRO, asserting that I had acted so as to change the "status quo" in violation of that order, and for leave to renew or reargue that portion of the 8/19/15 TRO that added the Second Arbitrator to the arbitration panel.

63. The State Court has not issued any ruling with respect to either of the aforementioned motions that were brought by orders to show dated October 13, 2015 or October 14, 2015.

64. In the meantime, AABS was at risk of forfeiting all of its rights under the Maltz Contract due to the passage of time. Under the latest amendment to the Maltz Contract, the latest date by which AABS could close under its contract was July 21, 2016. But for months, Mr. Birnbaum continued, in violation of the 8/19/15 TRO, to refuse to proceed to arbitration before the First Arbitrator and the Second Arbitrator. Moreover, the First Arbitrator has steadfastly

refused to arbitrate the dispute together with the Second Arbitrator as required by the 8/19/15 TRO.

65. Accordingly, in an effort to break the logjam and avoid a forfeiture, on July 5, 2016, my counsel filed an emergency motion in the State Court seeking to modify or vacate the 8/19/15 TRO so as to allow me to close, on behalf of AABS 1200 LLC, on the purchase of the Fort Hamilton Property.

66. Arguments on the motion were heard on July 6, 2016, however the State Court did not issue a decision regarding the motion. Instead, it granted time for the petitioners to submit opposition papers, and further argument was scheduled for July 19, 2016. On that date, the State Court scheduled a further hearing on the motion. With the Court needing time to review the papers, a new return date was set for August 3, 2016.

### The Filing of the Involuntary Petition and the State Court's Determination that the State Court Action is Completely Stayed As a Result

67. On July 20, 2016, three creditors who provided services to AABS before the entry of the 8/19/15 TRO filed an involuntary petition for relief under chapter 11 of the Bankruptcy Code against AABS.

68. On August 3, 2016, upon learning of the commencement of this involuntary case, the State Court stated that since AABS is named as one of the three petitioners in the State Court Action, all proceedings in the State Court Action are stayed unless this Court orders otherwise.

69. The Supreme Court Justice presiding in the State Court Action stated that she would not hold a further hearing in that case without instruction from this Court that it is cleared to proceed.

70. Accordingly, Party B under the Master Contract, consisting of Mr. Fishman and I, are completely stymied. We wish to proceed with the closing on the purchase of the Fort

Hamilton Property under the Maltz Contract before all rights of AABS thereunder, and the millions of dollars that I spent to preserve that contract since 2009, are lost. The State Court issued a temporary restraining order directing me to refrain from acting for AABS even though I had done so for years with the full knowledge and acquiescence of Mr. Birnbaum and Mr. Sofer, and the 8/19/15 TRO was supposed to be just that—temporary. An arbitration proceeding was supposed to be conducted by two arbitrators starting within 45 days of the 8/19/25 TRO. But the First Arbitrator, Birnbaum and Sofer have refused to comply with that order. To top it all off, the State Court is now refusing to take any action in the State Court Action unless this Court issues an order stating that the automatic stay does not prevent that action from proceeding.

71.    In addition, although they are not supposed to, there remains the risk that Messrs. Birnbaum and Sofer will not only cause AABS to close on the Maltz Contract, they may also seek to "flip" the Fort Hamilton Property to a third party and then distribute the sales proceeds to themselves or others acting in concert with them. Alternatively, they may seek to sell or assign AABS's interest in the Maltz Contract before this Court determines whether to enter an order for relief in this case. The consequences of such unilateral action, after I have poured millions of dollars into preservation of the Maltz Contract and development of the Fort Hamilton Property over the past several years, would be devastating to me. I am supposed to the owner of AABS. I have not had a fair opportunity to vindicate my rights under the Master Contract.

72.    I hereby affirm that the foregoing is true and correct.

**WHEREFORE**, I respectfully request that this Court enter an order (1) pursuant to 11 U.S.C. § 362(d)(1) confirming that the automatic stay does not apply to the non-debtor parties in the State Court Action or in the arbitration of disputes under the Master Contract, and modifying the automatic stay so as to permit the State Court Action and arbitration of the rights and

obligations of all parties to the above-described disputes to proceed in all respects, and (II) pursuant to section 303(f) of the Bankruptcy Code, conditioning the Alleged Debtor's right to use, acquire or dispose of property by prohibiting it from transferring its interest in the Maltz Contract, and from transferring the Fort Hamilton Property or any proceeds from a sale of its interest in the Maltz Contract or the Fort Hamilton Property, and from making any payments, distributions or transfers to any of its members, their relatives or any other insiders, pending a determination of this Court whether an order for relief against the Alleged Debtor should be entered in this case, and granting

such other and further relief as the Court deems just and proper.

                                                                           Samuel Pfeiffer

Affirmed to before me this 15 day
of August, 2016

_____
Notary Public

**KATYA SVERDLOV**
**NOTARY PUBLIC-STATE OF NEW YORK**
No. 02SV6284850
Qualified in Kings County
My Commission Expires July 08, 2017

19